UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 13 CIV 5628

```
_____x
JAMES H. HARRISON, JR.,                    :    Civil Action No.
Individually and on Behalf of All Others   :
Similarly Situated,                        :    COMPLAINT FOR VIOLATION OF THE
                                           :    FEDERAL SECURITIES LAWS
                        Plaintiffs,        :
                                           :
        vs.                                :
                                           :
LINN ENERGY, LLC, MARK E. ELLIS,           :
                                           :
KOLJA ROCKOV and DAVID B. ROTTINO,         :
                                           :
                        Defendants.        :
_____x
```



Plaintiffs James H. Harrison, Jr. ("Plaintiff") alleges the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by LINN Energy, LLC ("LINN" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of purchasers of LINN units between February 25, 2010 and July 3, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     LINN describes itself as a top-15 U.S. independent oil and natural gas development company whose mission is to acquire, develop and maximize cash flow from its portfolio of long-life oil and natural gas assets. LINN, a limited liability company, became a public entity when it issued "units" representing its limited liability company interests to the public in 2006. The units are listed and trade under the symbol "LINE" on the National Association of Securities Dealers Automated Quotation ("NASDAQ") Global Select Market.

3.     LINN units attract investors seeking yield-based investments as its limited liability company agreement requires that it make quarterly distributions to unitholders of all "available cash," as that term is defined by such agreement. According to its SEC filings, LINN's business strategy is to provide stability and growth of distributions for the long-term benefit of its unitholders. Thus, it is of particular significance to the marketplace that LINN demonstrate that it can provide investors with stable, if not increasing, cash distributions.

4.    During the Class Period, Defendants fraudulently misrepresented the true risk associated with the Company's ability to continue to issue stable or increasing distributions. Defendants did so by disseminating key financial metrics to investors that deceptively excluded the cost of options it used to hedge against fluctuations in the price of oil and natural gas, but included the proceeds it received from the sale or exercise of such options.

5.    According to numerous publications issued by the Company, these key financial metrics were used by LINN's management and investors to "evaluate cash flow and the Company's ability to sustain or increase distributions."

6.    When the calculation of these financial metrics, and, consequently, the true risks associated with the Company's ability to continue to issue stable or increasing distributions became known to the marketplace, the price of LINN units declined significantly.

7.    On July 1, 2013, the Company disclosed that the SEC opened an informal inquiry in connection with, among other things, the Company's use of these financial metrics.  On this news, LINN units declined $10.50 per unit, or 31.5%, over a two-day period to close at $22.79 per unit on July 3, 2013.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

10.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

11.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ Global Select Market, an electronic securities exchange located in this District.

## PARTIES

12.     Plaintiff James H. Harrison, Jr., as set forth in the accompanying certification incorporated by reference herein, purchased the units of LINN during the Class Period and has been damaged thereby.

13.     Defendant LINN, an independent oil and natural gas company, is a Delaware limited liability company that began its operations in March 2003. The Company maintains its principal executive offices in Houston, Texas.

14.     Defendant Mark E. Ellis ("Ellis") served, at all relevant times, as LINN's President and Chief Executive Officer. On December 31, 2011, Defendant Ellis also assumed the responsibilities of Chairman of the Company's Board of Directors.

15.     Defendant Kolja Rockov ("Rockov") served, at all relevant times, as LINN's Executive Vice President and Chief Financial Officer.

16.     Defendant David B. Rottino ("Rottino") served, at all relevant times, as LINN's Senior Vice President and Chief Accounting Officer.

17.     Defendants Ellis, Rockov and Rottino are collectively referred to herein as the "Individual Defendants."

18.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of LINN , were privy to confidential and proprietary information concerning LINN, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning LINN,

as discussed in detail below.  Because of their positions with LINN, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of LINN's business.

20.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

21.     The Individual Defendants, as senior executive officers and/or directors and as controlling persons of a publicly traded company whose units were, and are, governed by the federal

securities laws and are registered with the NASDAQ Global Select Market, had a duty to promptly disseminate accurate and truthful information with respect to LINN's financial condition, cash flow, performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of LINN units would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of LINN units by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding LINN's business, operations and management and the intrinsic value of LINN units; (ii) allowed the Company to obtain additional capital at favorable prices; (iii) enabled certain Company insiders to sell more than $34 million of their personally held LINN units; and (iv) caused Plaintiffs and members of the Class to purchase LINN units at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the units of LINN between February 25, 2010 and July 3, 2013, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LINN units were actively traded on the NASDAQ Global Select Market. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by LINN or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

26.     Plaintiff will fairly and adequately protect the interests of the other members of the Class  and  has  retained  counsel  competent  and  experienced  in  class  action  and  securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of LINN;

(c)     whether the price of LINN units was artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

28.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

29.      LINN is an independent oil and natural gas development company whose mission is to acquire, develop and maximize cash flow from its U.S. portfolio of long-life oil and natural gas assets.  The Company has become one of the largest oil and gas development companies in the U.S. by acquiring more than $10 billion of oil and gas related assets since its formation in 2003, with more than $3 billion of such acquisitions occurring in 2012 alone. LINN has financed these acquisitions with equity and debt offerings or bank borrowings, and to the extent available, cash flow from its operations.  LINN became a public entity in January 2006 when it issued to the public its "units," which represent limited liability company interests.[1]

30.      LINN's units attract investors seeking yield-based investments as its limited liability company agreement requires that it make quarterly distributions to unitholders of all "available cash," as that term is defined by such agreement.  LINN's SEC filings represents that its "primary goal is to provide stability and growth of distributions for the long-term benefit of its unitholders."

---

[1]  While many media accounts, and even the Individual Defendants themselves, referred to LINN as a master limited partnership or a "MLP" during the Class Period, the Company's website explicitly states that LINN "is not a MLP or a corporation, but a publicly traded limited liability company with partnership tax status."

[Emphasis added.]   Accordingly, it is of particular significance to the marketplace that LINN demonstrate that it can provide investors with stable, if not increasing, cash distributions.

31.    LINN maintains that it endeavors to accomplish this goal by acquiring long-life, high quality oil and gas properties; efficiently operating and developing its acquired properties; and employing hedging activities to reduce cash flow volatility.

32.    With respect to its hedging activities, the Company's SEC filings represent that it hedges a significant portion of its forecasted oil and gas production to reduce exposure to fluctuations in the prices of such commodities so that it can gain long-term cash flow predictability, pay distributions, service debt and manage its business.  LINN hedges its exposure to changes in oil and natural gas prices by using swap contracts, put options and derivative contracts.

### The Nature of Defendants' Materially False and Misleading Statements

33.    During the Class Period, Defendants issued false and misleading "non-GAAP" financial measures that presented investors with a materially inflated view of the Company's cash flows and, as a result, its ability to continue to sustain and/or grow its cash distributions.[2] In so doing, these false and misleading disclosures materially misrepresented the true risk associated with the Company's ability to issue stable or increasing distributions.

34.    These so called non-GAAP measures included terms that Defendants repeatedly referred to during Class Period as "distributable cash flow" or "DCF" and "distribution coverage ratio."  Because these terms are not defined in GAAP, nor were they defined by the Company during the Class Period, their use provided Defendants with cover for issuing materially false and misleading information about LINN's ability to continue to issue distributions.

---

[2]    Non-GAAP financial measures refer to financial information that is not calculated and presented in accordance with generally accepted accounting principles ("GAAP").

35.     During the Class Period, Defendants also repeatedly referred to another non-GAAP term, "adjusted EBITDA." This financial metric was important in the evaluation of LINN's cash flows, as Defendants represented that LINN's management used adjusted EBITDA to "evaluate cash flow and the Company's ability to sustain or increase distributions."

36.     While LINN provided investors with a reconciliation of "adjusted EBITBA" to its reported GAAP income, such reconciliation was, as explained below, materially false and misleading because Defendants failed to disclose how the reconciling items were derived. In failing to disclose such information, Defendants knowingly, or recklessly, provided investors with an overstated portrayal of LINN's ability to continue to sustain or increase distributions during the Class Period.

37.     As alleged herein, LINN acquired billions of dollars of oil and gas producing assets during the Class Period. When LINN acquires such assets, it typically budgets up to 10% of the cost of the acquisition to purchase put options that it uses to hedge the oil and/or gas produced by the acquired assets. During the Class Period, Defendants deceptively excluded the cost it paid to purchase put options from LINN's reported adjusted EBITDA and DCF amounts, but included the proceeds it received from the sale or exercise of such options in its reported adjusted EBITDA and DCF totals.

38.     The following hypothetical demonstrates how LINN'S reported adjusted EBITDA and DCF information materially misled investors during the Class Period:

> In 2011, when the price of oil is $80, LINN purchased for $20 a one-year option to sell oil at $100. During 2011, LINN excluded the $20 cost of such option from its reported adjusted EBITDA and DCF amounts. In 2012, when the price of oil is $85, LINN exercises its put option and includes the $100 it received from the exercise of put option in its reported adjusted EBITDA and DCF.

39.     Accordingly, during the Class Period, Defendants – in a "Heads I Win, Tails You Lose" fashion – deceptively failed to disclose to investors that its reported DCF and adjusted

EBITDA, which its management used to evaluate the Company's cash flow and ability to sustain or increase distributions, included the financial benefits of its hedging strategies while excluding the financial costs.

40.     In so doing, Defendants materially misrepresented the true risk associated with the Company's ability to continue to issue stable or increasing distributions.

### Materially False and Misleading Statements
### Made During the Class Period

41.     The Class Period begins on February 25, 2010. On that date, LINN issued a press release announcing its financial results for its fiscal 2009 fourth quarter and year end, the periods ended December 31, 2009.  For the year, the Company reported a loss from continuing operations of $296 million, or $2.48 per unit, including a noncash loss of $591 million, or $4.95 per unit, from the change in fair value of hedges covering future production. Notwithstanding these results, the Company reported a 10% increase in its adjusted EBITDA, from $514 million in 2008 to $566 million in 2009. For the 2009 fourth quarter, the Company reported a loss from continuing operations of $66 million, or $0.52 per unit, including a noncash loss of $129 million, or $1.01 per unit, from the change in fair value of hedges covering future production.

42.     Defendant Ellis commented on the results, stating, in pertinent part, as follows:

> LINN Energy overcame the challenging economic environment of 2009 to achieve exceptional results.  Through the drillbit and workover activities, we added 89 Bcfe of proved reserves - - replacing 112 percent of our production at a very attractive cost of $1.59 per Mcfe. We also delivered a return to our unitholders of more than 100 percent, grew production, generated a record level of adjusted net income, strengthened our balance sheet and hedge portfolio and announced acquisitions totaling $268 million dollars. Looking forward in 2010, we are confident that increased acquisition opportunities, complemented by drilling horizontal wells in the Granite Wash play, will provide significant growth potential for the Company.

43.     With respect to the sufficiency of its cash flows, the Company stated that its 2009 distribution coverage ratio was 1.14x, compared to mid-point guidance of 1.13x and that it generated

adjusted EBITDA of $566 million in 2009 compared to $514 million in 2008. The press release also noted that adjusted EBITDA is used by management to evaluate the Company's cash flow and its ability to sustain or increase distributions and included an explanation and reconciliation of the Company's Adjusted EBITDA, stating, in pertinent part, as follows:

> Adjusted EBITDA is a measure used by Company management to evaluate cash flow and the Company's ability to sustain or increase distributions. A reconciliation of adjusted EBITDA to income (loss) from continuing operations is provided in this release (see Schedule 1). The most significant reconciling items are interest expense and noncash items, including the change in fair value of derivatives and depreciation, depletion and amortization.

*     *     *

Schedule 1
LINN Energy, LLC
Explanation and Reconciliation of Adjusted EBITDA

*Adjusted EBITDA*

Adjusted EBITDA (a non-GAAP financial measure), as defined by the Company, may not be comparable to similarly titled measures used by other companies. Therefore, adjusted EBITDA should be considered in conjunction with income from continuing operations and other performance measures prepared in accordance with GAAP, such as operating income or cash flow from operating activities. Adjusted EBITDA should not be considered in isolation or as a substitute for GAAP measures, such as net income, operating income or any other GAAP measure of liquidity or financial performance.

The Company defines adjusted EBITDA as income (loss) from continuing operations plus the following adjustments:

- Net operating cash flow from acquisitions and divestitures, effective date through closing date;
- Interest expense;
- Depreciation, depletion and amortization;
- Impairment of goodwill and long-lived assets;
- Write-off of deferred financing fees and other;
- (Gain) loss on sale of assets, net;
- Unrealized (gain) loss on commodity derivatives;
- Unrealized (gain) loss on interest rate derivatives;
- Realized (gain) loss on interest rate derivatives;
- Realized (gain) loss on canceled derivatives;
- Unit-based compensation expenses;
- Exploration costs; and
- Income tax (benefit) expense.

Adjusted EBITDA is a measure used by Company management to indicate (prior to the establishment of any reserves by its Board of Directors) the cash distributions the Company expects to pay unitholders. Adjusted EBITDA is also a quantitative measure used throughout the investment community with respect to publicly-traded partnerships and limited liability companies.

The following presents a reconciliation of income (loss) from continuing operations to adjusted EBITDA:

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| | (in thousands) | | | |
| Income (loss) from continuing operations | $ (65,965) | $ 888,054 | $ (295,841) | $ 825,657 |
| Plus: | | | | |
| Net operating cash flow from acquisitions and divestitures, effective date through closing date [1] | 115 | (872) | 3,708 | 3,436 |
| Interest expense, cash | 23,195 | 16,782 | 74,185 | 81,704 |
| Interest expense, noncash | 3,810 | 6,536 | 18,516 | 12,813 |
| Depreciation, depletion and amortization | 49,848 | 46,834 | 201,782 | 194,093 |
| Impairment of goodwill and long-lived assets | — | 50,505 | — | 50,505 |
| Write-off of deferred financing fees and other | — | — | 204 | 6,728 |
| (Gain) loss on sale of assets, net | 239 | (98,763) | (23,051) | (98,763) |
| Unrealized (gain) loss on commodity derivatives | 128,652 | (884,865) | 591,379 | (734,732) |
| Unrealized (gain) loss on interest rate derivatives | (10,261) | 44,634 | (16,588) | 50,638 |
| Realized loss on interest rate derivatives [2] | 11,252 | 4,557 | 42,881 | 16,036 |
| Realized (gain) loss on canceled derivatives | — | — | (48,977) | 81,358 |
| Unit-based compensation expenses | 3,616 | 3,301 | 15,089 | 14,699 |
| Exploration costs | 2,544 | 4,654 | 7,169 | 7,603 |
| Income tax (benefit) expense | (4,600) | 1,665 | (4,221) | 2,712 |
| Adjusted EBITDA from continuing operations | $ 142,445 | $ 83,022 | $ 566,235 | $ 514,487 |

[1]   Includes net operating cash flow from acquisitions and divestitures.

[2]   During 2009, the Company revised its definition of adjusted EBITDA to include realized (gains) losses on interest rate derivatives in order to match the related interest expense. Amounts reported in adjusted EBITDA for all prior periods have been reclassified to conform to current period presentation. This reclassification had no effect on the Company's reported net income.

44.     Similar disclosure of the explanation and reconciliation of LINN's adjusted EBITDA was repeated during the remainder of the Class Period in the press releases describing LINN's earnings.

45.     Following the Company's 2009 fourth quarter and year-end earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's EBITDA and cash flows. For example, Defendants stated, in pertinent part, as follows:

Defendant Ellis:

During 2009, we delivered a return to unit holders of more than 100%, announced $268 million in acquisitions and made a strategic entry into the Permian Basin. We also strengthened our balance sheet and hedge portfolio and generated a record level of adjusted EBITDA and net income.

On February 12th, we paid our fourth quarter 2009 cash distribution of $0.63 per unit. This marked Linn's 16th consecutive quarterly cash distribution since its IPO in January of 2006 and represents $9 per unit in cash distributions paid to unit holders since that time.

Defendant Rockov:

For the fourth quarter, we generated strong cash flow ahead of guidance. We generated adjusted EBITDA of $142 million for the fourth quarter, compared to midpoint guidance of $139 million. And $566 million for fiscal 2009 compared to a midpoint guidance of $563 million.

On a per-unit basis, our distributable cash flow was $0.66 per unit for the fourth quarter and $2.88 per unit for the full year 2009. Compared to our cash distribution of $0.63 per unit, we achieved a favorable distribution coverage ratio of 1.04 for the fourth quarter 2009 compared to a guidance of 1.0; and 1.14 for the full year 2009 compared to guidance of 1.13.

Looking forward to 2010 at the midpoint of our guidance ranges, we expect to generate adjusted EBITDA of approximately $138 million in the first quarter and $570 million for the full year. Distributable cash flow is estimated to be approximately $87 million for the first quarter and $364 million for the year, which implies a distribution coverage ratio of 1.06 for the first quarter and 1.10 for the fiscal year 2010.

As Mark indicated, our guidance for 2010 includes the positive impact of new drilling activity in the Granite Wash. As a result, we expect the second half of 2010 will be increasingly benefited by new volumes in the Granite Wash, leading to stronger cash flow coverage and distribution coverage ratios as the year progresses. However, we believe the impact of Granite Wash drilling program will realize its full potential in 2011 and beyond.

Along with an active acquisition program, we view our Granite Wash acreage as a key element to our future growth strategy. We evaluate drilling in the Granite Wash in terms of accretion to distributable cash flow per unit, just as we do in the evaluation of acquisitions. Based on our estimated economics, these wells are expected to be significantly more accretive than acquisitions.

46.     That same day, February 25, 2010, LINN filed with the SEC its Form 10-K, signed

by the Individual Defendants, for the year ended December 31, 2009 (the "2009 Form 10-K"). The

2009 Form 10-K contained materially false and misleading statements about the Company's adjusted

EBITDA, which the 2009 Form 10-K states is "used by management to evaluate cash flow and the

Company's ability to sustain or increase distributions."

47.    The 2009 Form 10-K also included materially false and misleading representations

about the Company's disclosure controls and Defendants Ellis's and Rockov's certifications thereon,

stating, in pertinent part:

> The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including the Company's Chief Executive Officer and Chief Financial Officer, and the Company's Audit Committee of the Board of Directors, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.
>
> *       *       *
>
> I, [Defendants Ellis and Rockov], certify that:
>
> 1.    I have reviewed this Annual Report on Form 10-K of Linn Energy, LLC (the "registrant");
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-5(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

48.     The above representations about the Company's disclosure controls, and Defendants Ellis's and Rockov's certifications thereon, were repeated, in all material respects, in the Forms 10-K and 10-Q that LINN later filed with the SEC during the Class Period.

49.     On March 29, 2010, LINN completed a public offering of 17,250,000 units at $25.00 per unit yielding the Company net proceeds of approximately $413.7 million.

50.     On March 30, 2010, LINN and its wholly owned subsidiary, Linn Energy Finance Corp., announced a private offering of $1.3 billion in aggregate principal amount of 8.625% senior unsecured notes due 2020 at an offering price equal to 97.552% of par.

51.     On April 29, 2010, LINN issued a press release announcing its financial results for its 2010 first quarter, the period ended March 31, 2010.  For the quarter, the Company reported income from continuing operations of $65 million, or $0.50 per unit, including a noncash gain of $33 million, or $0.26 per unit, from the change in fair value of hedges covering future production.

52.     With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.26x, compared to 1.04x for the fourth quarter 2009 and that it generated adjusted EBITDA of $152 million during the first quarter 2010, compared to $142 million for the fourth quarter 2009. In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in ¶43 above.

53.     Defendant Ellis commented on the results, stating, in pertinent part, as follows:

> We had an outstanding start to the year and again delivered strong operational and financial results that exceeded our performance targets.  In the first quarter alone, we announced an acquisition that marks our entry into a new operating area in Michigan's Antrim Shale, and another that strengthens our foothold in the Permian Basin. We completed successful equity and senior notes offerings, extended the maturity of our credit facility, and recently announced our 17th consecutive quarterly distribution to our unitholders. Additionally, we enhanced our hedge portfolio, which provides more certainty to our cash flow and supports future distributions.

54.     Following the Company's 2010 first quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendants stated, in pertinent part, as follows:

<u>Defendant Ellis</u>:

> During the first quarter LINN again delivered excellent operating and financial results that exceeded guidance across the board.  On Tuesday we announced that on

May 14 we will pay our 17th consecutive cash distribution of $0.63 per unit, which offers our investors a current annualized yield of approximately 9.5%. And since LINN's initial public offering in January of 2006 our total return to unitholders has been approximately 90%.

Defendant Rockov:

For the first quarter we generated strong cash flow ahead of guidance. We generated adjusted EBITDA of approximately $152 million for the first quarter compared to midpoint guidance of $138 million. On a per unit basis our distributable cash flow was $0.79 per unit. When compared to our cash distribution of $0.63 per unit we achieved the strongest distribution coverage ratio of 1.26 times for the first quarter 2010, well exceeding our guidance of 1.06 times.

Looking forward to the remainder of 2010, at the midpoint of our guidance ranges we expect to generate adjusted EBITDA of approximately $165 million in the second quarter and approximately $660 million for the full year. Distributable cash flow is estimated to be approximately $100 million for the second quarter and $410 million for the year which implies a distribution coverage ratio of 1.06 times for the second quarter and 1.13 times for fiscal year 2010.

*     *     *

As a result of our hedging activities we now have a six-year hedge book with approximately 90% of our current expected production hedged on an equivalent basis through 2013. This provides more certainty to our cash flow and supports future distributions. We believe we are well positioned both financially and operationally to continue to grow and we are aggressively pursuing additional acquisitions to capitalize on our momentum.

On April 27 we announced a cash distribution of $0.63 per unit for the first quarter 2010 which we will be paid on May 14 to unitholders of record as of the close of business on May 7. This distribution represents our 17th consecutive quarterly distribution. At yesterday's closing price of $26.51 per unit our yield is approximately 9.5% based on our current annualized distribution rate of $2.52 per unit.

55.     That same day, April 29, 2010, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the 2010 first quarter ended March 31, 2010 (the "2010 Q1 Form 10-Q"). The 2010 Q1 Form 10-Q contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

- 17 -

56.     On July 1, 2010, LINN announced that it signed, subject to closing conditions, a definitive purchase agreement to acquire oil and natural gas properties located in the Permian Basin for a contract price of $90 million.

57.     On July 19, 2010, LINN announced that it signed, subject to closing conditions, a definitive purchase agreement to acquire oil and natural gas properties located in the East Texas Oil Field in Gregg and Rusk Counties for a contract price of $95 million.

58.     On July 29, 2010, LINN issued a press release announcing its financial results for its 2010 second quarter, the period ended June 30, 2010.  For the quarter, the Company reported income from continuing operations of $60 million, or $0.41 per unit, including a noncash gain of $41 million, or $0.27 per unit, from the change in fair value of hedges covering future production.

59.     With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.20x, compared to 1.26x for the first quarter 2010 and that it generated adjusted EBITDA of $175 million during the second quarter 2010, compared to $152 million for the first quarter 2010.  In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in ¶43 above.

60.     Defendant Ellis commented on the results, stating, in pertinent part, as follows:

> Year to date, we have closed and/or announced approximately $1 billion in acquisitions.  We believe these acquisitions, along with continued exceptional results from the Granite Wash drilling program, create the strong potential for future growth in distributions.

61.     Following the Company's 2010 second quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendant Rockov stated, in pertinent part, as follows:

> For the second quarter, we generated strong cash flow ahead of guidance. We generated adjusted EBITDA of approximately $175 million to the second quarter,

compared to mid-point guidance of $164 million. On a per unit basis, our distributable cash flow was $0.76 per unit. When compared to our cash distribution of $0.63 per unit, we achieved a strong distribution coverage ratio of 1.2 times for the second quarter of 2010, well exceeding our guidance of 1.06 times.

Looking forward to the remainder of 2010, at the mid-point of our guidance ranges, we expect to generate adjusted EBITDA of approximately $178 million for the third quarter and approximately $689 million for the full-year.

Distributable cash flow is estimated to be approximately $107 million for the third quarter and $433 million for the year, which implies the healthy distribution coverage ratios of 1.15 times for the third quarter and 1.2 times for the fiscal 2010.

Adding further stability to our long-term cash flow, in April, we opportunistically hedged additional natural gas volumes for 2012 through 2015, and added to our oil positions for 2011 through 2013 at very attractive prices compared to the current forward strip. A detailed hedge table is included in the supplemental information available on our website.

62.     That same day, July 29, 2010, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the 2010 second quarter ended June 30, 2010 (the "2010 Q2 Form 10-Q"). The 2010 Q2 Form 10-Q contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

63.     On September 7, 2010, LINN announced that it signed, subject to closing conditions, three definitive purchase agreements to acquire oil and natural gas properties located in the Wolfberry trend of the Permian Basin for a combined price of $352.2 million.

64.     On September 8, 2010, LINN and its Linn Energy Finance Corp. subsidiary announced a private offering of $1 billion in aggregate principal amount of 7.75% senior unsecured notes due 2021 at an offering price equal to 98.264% of par.

65.     On October 25, 2010, LINN announced a 5% increase in its quarterly cash distribution to $0.66 per unit.

66.    On October 28, 2010, LINN issued a press release announcing its financial results for its 2010 third quarter, the period ended September 30, 2010.  For the quarter, the Company reported income from continuing operations of $4 million, or $0.03 per unit, including a noncash losses of $39 million, or $0.26 per unit, from the change in fair value of hedges covering future production.

67.    With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.18x, compared to 1.20x for the second quarter 2010 and that it generated adjusted EBITDA of $185 million during the third quarter 2010, compared to $175 million for the second quarter 2010.  In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in ¶43 above.

68.    Defendant Ellis commented on the results, stating, in pertinent part, as follows:

LINN's quarterly cash distribution increase reflects our positive outlook for the future, given our acquisition success, projected organic growth and extensive commodity hedge portfolio. We already have approximately $1.2 billion in acquisitions pending or closed this year, and we currently have an undrawn $1.5 billion credit facility, which positions us to continue pursuing accretive acquisitions. We believe that our strengthened commodity hedge portfolio, continued accretive acquisitions and projected organic growth will provide us with the ability to grow future distributions while simultaneously growing our distribution coverage ratio.

69.    Following the Company's 2010 third quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendants stated, in pertinent part, as follows:

Defendant Ellis:

On Monday, we announced a 5% increase in Linn's cash distribution to $0.66 per unit for the third quarter of 2010 or $2.64 per unit on an annualized basis. This increase reflects our positive outlook for the future. We believe that our strength in commodity hedge book, continued accretive acquisitions, and projected organic growth will provide us with the ability to consistently grow future distributions while simultaneously growing our distribution coverage ratio.

*      *      *

We were resilient in 2008, consistently paying a stable distribution. In 2009, we climbed to new heights, delivering more than 100% total return to our unitholders. This year we have continued this assent with record production levels and adjusted EBITDA as well as an increased distribution. We look forward to continuing this trend.

Defendant Rockov:

For the third quarter, we generated strong cash flow ahead of guidance. Adjusted EBITDA for the third quarter was up 30% year-over-year to $185 million and also compared favorably to the midpoint guidance of $178 million.

On a per unit basis, our distributable cash flow was $0.75 per unit, which resulted in a distribution coverage ratio of 1.18 times compared to guidance of 1.15 times. Adjusting for our recently announced 5% distribution increase of $0.03, coverage for the quarter was 1.13 times.

Looking forward to the fourth quarter 2010 at the midpoint of our guidance ranges, we expect to generate adjusted EBITDA of approximately $205 million. Distributable cash flow per unit is estimated to be approximately $0.79, which implies a strong distribution coverage ratio of 1.2 times for the fourth quarter.

We are very pleased to be on a fourth-quarter run rate of 1.2 times coverage including the recent 5% distribution increase. Our expected organic growth rate of more than 25% year-over-year gives us the confidence to deliver not only further distribution increases but increasing distribution coverage ratios as well.

Hedging a significant amount of our production has always been a key component to our strategy and has allowed us to deliver stable distributions through some of the most turbulent markets. As we look forward, our organic growth rate is expected to be very strong and should give us the opportunity to consistently grow distributions.

*     *     *

This week we announced a 5% increase to our distribution, which is now $2.64 per year. This increase reflects management and the Board of Directors confidence in the stability and future growth of the Company. We are pleased the market has begun to recognize the strong future growth potential of Linn Energy. However with a current yield of 7.8%, we also look forward to this trend continuing.

70.     That same day, October 28, 2010, LINN filed with the SEC its Form 10-Q, signed by

Defendant Rottino, for the 2010 third quarter ended September 30, 2010 (the "2010 Q3 Form 10-

Q"). The 2010 Q3 Form 10-Q contained materially false and misleading statements about the

Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

71.     On December 14, 2010, LINN completed a public offering of 11,500,000 units at $35.92 per unit yielding the Company net proceeds of approximately $396 million.

72.     On February 24, 2011, LINN issued a press release announcing its financial results for its fiscal 2010 fourth quarter and year end, the periods ended December 31, 2010.  For the year, the Company reported a loss from continuing operations of $114 million, or $0.80 per unit, including a noncash loss of $232 million, or $1.63 per unit, from the change in fair value of hedges covering future production.  For the 2010 fourth quarter, the Company reported a loss from continuing operations of $244 million, or $1.64 per unit, including  a noncash loss of $267 million, or $1.80 per unit, from the change in fair value of hedges covering future production.

73.     With respect to the sufficiency of its cash flows, the Company reported 2010 distribution coverage ratio of 1.23x, compared to 1.14x for the 2009 year and that it generated adjusted EBITDA of $732 million during 2010 compared to $566 million in 2009.  In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in ¶43 above.

74.     Defendant Ellis commented on the results, stating, in pertinent part, as follows:

LINN delivered exceptional performance and growth in 2010. We increased our distribution by 5 percent and delivered a total return of more than 45 percent to our unitholders.  The Company grew to an enterprise value of approximately $9 billion - making it one of the top-10 master limited partnerships and top-25 independent oil and gas development companies in the U.S.  This substantial growth was fueled by increased organic production and approximately $1.4 billion in acquisitions. We believe our strong balance sheet will enable us to continue capitalizing on future acquisition opportunities that, when coupled with significant growth from our organic activities, should provide us with the potential for future distribution increases.

75.    Following the Company's 2010 fourth quarter and year-end earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendants stated, in pertinent part, as follows:

Defendant Ellis:

During 2010, we increased the distribution about 5% and delivered a return to unit holders of more than 45%. On February 14, we paid our fourth quarter 2010 cash distribution of $0.66 per unit or $2.64 on an annualized basis.  Additional accretive acquisitions and significant production growth, combined with the strength of our commodity hedge portfolio, should provide us with the ability to increase future distributions.

Last year, we increased adjusted EBITDA by almost 30% to $732 million, compared to $566 million in 2009. Production increased during the fourth quarter by approximately 43% to $370 million -- or $307 million a day, from $215 million a day in 2009.

Defendant Rockov:

For the fourth quarter, adjusted EBITDA increased by more than 50% to $221 million and by almost 30% to $732 million for full-year 2010.  On a per-unit basis, our distributable cash flow is $0.88 per unit for the fourth quarter and $3.18 per unit for the full year 2010.  When compared to our cash distribution of $0.66 per unit, we achieved an exceptional distribution coverage ratio of 1.34 times for the fourth quarter and 1.23 times for the full year 2010.

During 2010, we accessed the capital markets through public equity offerings and two bond offerings that provided net proceeds of approximately $3 billion. These transactions allowed us to finance $1.4 billion of acquisitions and pay off all of our outstanding bank debt.

*        *        *

For full year 2011 at the midpoint of our guidance range, we expect to generate adjusted EBITDA of approximately $880 million. Distributable cash flows are estimated to be approximately $525 million, implying a distribution coverage ratio of 1.24 times for the year.

As noted in our full-year guidance estimates, we expected adjusted EBITDA and our distribution coverage ratio to significantly increase from the first quarter and continue to increase throughout 2011. Strong distribution coverage, coupled with additional accretive acquisitions should provide us with the ability to grow future distributions.

76.     On February 28, 2011, LINN filed with the SEC its Form 10-K, signed by the Individual Defendants, for the year ended December 31, 2010 (the "2010 Form 10-K"). The 2010 Form 10-K contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

77.     That same date, February 28, 2011, LINN announced that it signed, subject to closing conditions, three definitive purchase agreements to acquire oil properties for a total combined contract price of $434 million.

78.     On or about March 4, 2011, LINN completed a public offering of 16,726,067 units at $38.82 per unit yielding the Company net proceeds of approximately $623 million.

79.     On April 28, 2011, LINN issued a press release announcing its financial results for its 2011 first quarter, the period ended March 31, 2011. For the quarter, the Company reported a net loss of $447 million, or $2.75 per unit, including a noncash loss of $425 million, or $2.62 per unit, from the change in fair value of hedges covering future production.

80.     With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.15x, compared to 1.34x for the fourth quarter 2010 and that it generated adjusted EBITDA of $210 million during the first quarter 2011, compared to $221 million for the fourth quarter 2010. In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in ¶43 above.

81.     Defendant Ellis commented on the results, stating, in pertinent part, as follows:

> LINN Energy is off to a strong start in 2011. To date, we have executed acquisition agreements totaling $637 million. These acquisitions enabled us to enter a new operating region in the Williston Basin and solidified our Permian presence even further. On the financial front, we strengthened our position through a $649 million public equity offering that helped fund recent acquisitions. We also retired 81 percent of our highest cost debt, which will significantly reduce interest expense.

With our successful acquisition activity and impressive organic growth profile, we increased 2011 guidance. We believe our distribution coverage ratio for the remainder of the year will average approximately 1.40x, which should provide us with the ability to increase our distribution this year.

82.    Following the Company's 2011 first quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows. For example, Defendant Rockov stated, in pertinent part, as follows:

Adjusted EBITDA for the first quarter of 2011 increased 39% over the first quarter 2010 to $210 million. On a per unit basis, our distributable cash flow was $0.76 per unit for the first quarter. When compared to our cash distribution of $0.66 per unit, we achieved a distribution coverage ratio of 1.15 times for the quarter.

Enthusiastic response to our public equity offering in the first quarter made it the largest equity offering ever completed in the MLP sector at the time. The $649 million equity offering provided net proceeds of $623 million. These proceeds were used to fund recent acquisitions and helped delever the Company. Given our revised guidance, we are well on track to reduce our debt to EBITDA ratio to less than 3 times for 2011.

*       *       *

Turning to guidance for the full year 2011, at the midpoint of our guidance range, we expect to generate adjusted EBITDA of approximately $1 billion. Distributable cash flow is estimated to be approximately $612 million applying a distribution coverage ratio of approximately 1.34 times for the year.

83.    That same day, April 28, 2011, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the 2011 first quarter ended March 31, 2011 (the "2011 Q1 Form 10-Q"). The 2011 Q1 Form 10-Q contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

84.    On May 9, 2011, LINN announced that it signed, subject to closing conditions, a definitive purchase agreement with Panther Energy Company, LLC and Red Willow Mid-Continent,

LLC to acquire 40 percent of their oil and natural gas properties located in Ochiltree and Lipscomb Counties, Texas and Ellis County, Oklahoma for a contract price of $220 million.

85.     On July 26, 2011, LINN announced a 5% increase in its quarterly cash distribution to $0.69 per unit.

86.     On July 28, 2011, LINN issued a press release announcing its financial results for its 2011 second quarter, the period ended June 30, 2011. For the quarter, the Company reported net income of $237 million, or $1.34 per unit, including a noncash gain of $163 million, or $0.93 per unit, from the change in fair value of hedges covering future production.

87.     With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.42x (excluding above noted 5 percent distribution increase), compared to 1.15x for the first quarter 2011 and, that it generated adjusted EBITDA of $264 million during the second quarter 2011, compared to $210 million for the first quarter 2011.  In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in ¶43 above.

88.     Defendant Ellis commented on the results, stating, in pertinent part, as follows:

> We have already closed more than $850 million in acquisitions, setting a strong pace for the year. In addition, our organic growth program is on track to deliver an estimated 30 percent growth year-over-year. Our strong second quarter results, coupled with our projected future growth, positioned us to raise our distribution by 5 percent. This is the second time we have raised the distribution in the last nine months, and represents a 10 percent increase since the second quarter 2010.

89.     Following the Company's 2011 second quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendants stated, in pertinent part, as follows:

<u>Defendant Ellis</u>:

Now as the results indicate, during the second quarter LINN continued its positive momentum by closing acquisitions totaling approximately $620 million, generating record adjusted EBITDA, and raising our distribution by 5% for the second time within nine months.

Defendant Rockov:

Adjusted EBITDA (technical difficulty) second quarter 2011 increased 50% over the second quarter 2010 to $264 million, a record for LINN. On a per unit basis our distributable cash flow was $0.94 for the second quarter. When compared to our cash distribution of $0.69 per unit for the quarter, we achieved a distribution coverage ratio of 1.42 times, excluding the 5% distributions increase, and 1.36 times including the recent increase.

*    *    *

Turning to guidance, for the full year 2011 at the midpoint of our guidance range we expect to generate adjusted EBITDA of approximately $1 billion. Distributable cash flow is estimated to be approximately $590 million, implying a distribution coverage ratio of approximately 1.25 times for the year.

90.    That same day, July 28, 2011, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the 2011 second quarter ended June 30, 2011 (the "2011 Q2 Form 10-Q"). The 2011 Q2 Form 10-Q contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

91.    On October 27, 2011, LINN issued a press release announcing its financial results for its 2011 third quarter, the period ended September 30, 2011. For the quarter, the Company reported net income of $838 million, or $4.74 per unit, including a noncash gain of $732 million, or $4.15 per unit, from the change in fair value of hedges covering future production.

92.    With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.10x, compared to 1.42x for the second quarter 2011 and that it generated adjusted EBITDA of $243 million during the third quarter 2011, compared to $264 million

for the second quarter 2011.  In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in ¶43 above.

93.     Defendant Ellis commented on the results, stating, in pertinent part, as follows:

LINN's capital program continues to deliver positive results with quarter-over-quarter production growing 6 percent. Our organization has the ability to quickly assess current market conditions and act on them.  In the third quarter, we capitalized on the volatility of the markets by repurchasing a portion of our units and strengthening our commodity hedge positions for 2012 and 2013. Our strategy enables us to prosper during turbulent markets, as evidenced by our strong relative performance compared to major indices in both the E&P and MLP markets.

94.     Following the Company's 2011 third quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendants stated, in pertinent part, as follows:

Defendant Ellis:

So far this year we have closed or signed agreements for approximately $1 billion in acquisitions. We also marked our 23rd consecutive quarterly cash distribution by announcing our third-quarter distribution in the amount of $0.69 per unit.  Notably, we increased our distribution by 5% on two separate occasions over the past 12 months, for a total of 10%.  Now, since our IPO in 2006, we will have paid $13.70 per unit in distributions and generated a total return of over 200%

Defendant Rockov:

Adjusted EBITDA for the third quarter 2011 increased 30% over the third quarter 2010 to $243 million.  On a per-unit basis, our distributable cash flow was $0.76 for the third quarter.  When compared to our cash distribution of $0.69 per unit for the quarter, we achieved a distribution coverage ratio of 1.1 times.

*       *       *

Now we'll turn to guidance for the fourth quarter 2011. At the midpoint of our guidance range, we expect to generate adjusted EBITDA of approximately $252 million. Distributable cash flow is estimated to be approximately $137 million, which implies a distribution coverage ratio of approximately 1.12 times for the fourth quarter.

At the midpoint of guidance for the full year 2011, we expect to generate adjusted EBITDA of approximately $969 million.

Distributable cash flow is estimated to be $562 million, which implies a distribution coverage ratio of approximately 1.18 times for the full year 2011.

Linn has continued to provide stable distributions to our unit holders since our IPO in 2006. We have increased that distribution by 73% since our IPO and 10% in the last 12 months. We have the financial strength and flexibility to capitalize on the active acquisition market. The strength of our strategy has driven strong unit holder returns that have outperformed the major E&P and MLP indices during a very turbulent market this year.

95.     That same day, October 27, 2011, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the 2011 third quarter ended September 30, 2011 (the "2011 Q3 Form 10-Q"). The 2011 Q3 Form 10-Q contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

96.     On November 4, 2011, LINN announced that it signed, subject to closing conditions, a definitive purchase agreement to acquire mid-continent oil and natural gas properties located primarily in the Granite Wash of Texas and Oklahoma from Plains Exploration & Production Company for a contract price of $600 million.

97.     On or about January 19, 2012, LINN completed a public offering of 19,550,000 units at $35.95 per unit yielding the Company net proceeds of approximately $674 million.

98.     On February 23, 2012, LINN issued a press release announcing its financial results for its fiscal 2011 fourth quarter and year end, the periods ended December 31, 2011. For the year, the Company reported net income of $438 million, or $2.52 per unit, including a noncash gain of $193 million, or $1.11 per unit, from the change in fair value of hedges covering future production. For the 2011 fourth quarter, the Company reported a net loss of $190 million, or $1.09 per unit,

including a noncash loss of $278 million, or $1.60 per unit, from the change in fair value of hedges covering future production.

99.    With respect to the sufficiency of its cash flows, the Company reported a 2011 distribution coverage ratio of 1.24x, compared to 1.23x for the 2010 year and that it generated adjusted EBITDA of $998 million during 2011 compared to $732 million in 2010.  In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in in ¶43 above.

100.    Defendant Ellis commented on the results, stating, in pertinent part, as follows:

LINN delivered exceptional results in 2011.  Most significant to our unitholders, our performance enabled us to raise our quarterly cash distribution by 5 percent for the second year in a row and pay our 23rd consecutive distribution. The company achieved record organic production growth of 30 percent, and closed approximately $1.5 billion in acquisitions that added 579 billion cubic feet equivalent of reserves. Through organic growth and acquisitions, combined, we replaced more than 670 percent of our production.

Our diverse asset base allows us to focus organic growth on high-return, liquids-rich plays in the year ahead, and we expect to generate 20 percent organic production growth in 2012. Our balance sheet and access to capital markets position us to continue growing through acquisitions as well. We are currently evaluating numerous acquisition opportunities, which lead us to believe that 2012 could be another robust acquisition year.  Organic and acquisition growth, coupled with our strong commodity hedge portfolio, provides both stability and potential for future distribution growth.

101.    Following the Company's 2011 fourth quarter and year-end earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows. For example, Defendant Rockov stated, in pertinent part, as follows:

For the fourth quarter, adjusted EBITDA increased by more than 27% to $281 million and 36% to $998 million for the full year 2011. On a per-unit basis, our distributable cash flow was $0.94 per unit for the fourth quarter, and $3.40 per unit for the full year 2011.

When compared to our quarterly cash distribution of $0.69 or annualized distribution of $2.76 per unit, we achieved an exceptional distribution coverage ratio of 1.36 times for the fourth quarter, and 1.24 times for the full year 2011.

\*     \*     \*

On the other hand, with oil trading well above $100 per barrel today, our put contracts allow us to enjoy the benefits of a strong oil price environment on a portion of our oil production. At the midpoint of our guidance range, we expect to generate adjusted EBITDA of approximately $270 million for the first quarter 2012, and $1.2 billion for the full year 2012. Attributable cash flow is estimated to be approximately $136 million for the first quarter and $624 million for the full year, implying a distribution coverage ratio of 1.05 times for the first quarter and 1.15 times for the year.

\*     \*     \*

As noted in our full-year guidance estimates, we expect adjusted EBITDA and our distribution coverage ratio to significantly increase from the first quarter and continue to increase throughout 2012. We currently anticipate a very active year on the acquisition front, which is not included in our current guidance.

102.    On February 23, 2012, LINN filed with the SEC its Form 10-K, signed by the Individual Defendants, for the year ended December 31, 2011 (the "2011 Form 10-K"). The 2011 Form 10-K contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

103.    On February 27, 2012, LINN announced that it signed, subject to closing conditions, a definitive purchase agreement to acquire Hugoton Basin properties located in Kansas from BP America Production Company for a contract price of $1.2 billion.

104.    On February 28, 2012, LINN and its subsidiary, Linn Energy Finance Corp., announced a private offering to eligible purchasers of $1.8 billion in aggregate principal amount of its 6.25% senior unsecured notes due 2019 at an offering price equal to 99.989 percent of par.

105. On March 9, 2012, LINN announced that it signed, subject to closing conditions, a definitive purchase agreement to acquire properties located in East Texas for a contract price of $175 million.

106. On April 24, 2012, LINN announced a 5% increase in its quarterly cash distribution to $0.725 per unit.

107. On April 26, 2012, LINN issued a press release announcing its financial results for its 2012 first quarter, the period ended March 31, 2012. For the quarter, the Company reported a net loss of $6 million, or $0.04 per unit, including a noncash loss of $53 million, or $0.28 per unit, from the change in fair value of hedges covering future production.

108. With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.14x (including above noted 5 percent distribution increase), compared to 1.36x for the fourth quarter 2011 and that it generated adjusted EBITDA of $302 million during the first quarter 2012, compared to $281 million for the fourth quarter 2011. In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in ¶43 above.

109. Defendant Ellis commented on the results, stating, in pertinent part, as follows:

LINN has already announced approximately $1.8 billion of transactions in the first quarter, exceeding our total acquisitions for the full-year 2011. Based on this jumpstart to the year and our outlook for the remainder of 2012, our Board of Directors approved a 5 percent increase in our distribution to $0.725 per unit, or $2.90 per unit on an annualized basis, for the first-quarter 2012. This will mark the third consecutive year we have increased the distribution by 5 percent.

Our strong balance sheet and access to capital markets position us to continue to capitalize on the robust acquisition market and pursue our organic growth strategy. Consistent with our hedging strategy, we also further strengthened our industry-leading hedge positions to provide approximately 100 percent coverage on natural gas for six years and oil for four years. We had a phenomenal first quarter, and we expect continued strong performance for the remainder of the year.

110.    Following the Company's 2012 first quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendants stated, in pertinent part, as follows:

Defendant Ellis:

This week we announced a 5% increase to our cash distribution for the first quarter. The distribution of $0.725 per unit, or $2.90 per unit on an annual basis, will be paid May 15, 2012, to unit holders of record as of the close of business on May 8, 2012. Now this marks the third consecutive year we have increased the distribution by 5%.

*       *       *

Now, as I mentioned earlier, Linn has executed a total of $1.8 billion in acquisition and joint venture agreements year-to-date. These transactions are expected to be immediately accretive to cash flow per unit, and the Company has already hedged approximately 100% of expected production for five years.  We attribute this early success to our agility and financial strength.

Defendant Rockov:

Adjusted EBITDA for the first quarter 2012 increased 44% over the first quarter of 2011 to $302 million.  On a per unit basis, our distributable cash flow was $0.83 for the first quarter.  We achieved a distribution coverage ratio of 1.14 times, which includes the recent 5% distribution increase.

Turning to guidance for the full year 2012, at the midpoint of our range, we expect to generate adjusted EBITDA of approximately $1.37 billion.  Distributable cash flow is estimated to be approximately $676 million, implying a distribution coverage ratio of approximately 1.18 times for the year, which includes the impact of the recent 5% distribution increase. Most importantly, our 5% distribution increase reflects our bullish outlook on the remainder of 2012.  We project coverage to be over 1.2 times for the third and fourth quarters of 2012, including the 5% increase, and obviously, does not include accretion from any additional acquisitions.

Adhering to our strategy to remain significantly hedged, we have recently been aggressively building our long-gated positions.  As of today, I'm proud to say that we have now hedged 100% of our expected natural gas production through 2017, or six years.  With respect to oil, we are now hedged 100% through 2015, or four years, and 82% for 2016, the fifth year.

Our expectation is that we will finish hedging crude in the next few months, such that we will be 100% hedged for five years.  In addition, concurrent with our BP

- 33 -

acquisition, we hedged almost 70% of our NGL volumes for five years, utilizing natural gas puts.

We believe our industry-leading hedging strategy is not only providing the obvious, which is excellent distribution stability through commodity price downturns, but, in addition, it protects our assets and cost of capital. In other words, it positions Linn in an environment like today to be a buyer when others are experiencing weakness. At the end of the day, given our pace of acquisition growth, this is really the key.

As we have always said, we do not try to predict price movements. We stay true to our strategy and let acquisition velocity and organic growth more than make up for any upside we may or may not participate in. However, it is also important to note, again, that 30% to 40% of our hedge portfolio is in the form of puts, which allows us to realize significant upside as well.

111.    That same day, April 26, 2012, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the 2012 first quarter ended March 31, 2012 (the "2012 Q1 Form 10-Q"). The 2012 Q1 Form 10-Q contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

112.    On June 25, 2012, LINN announced that it signed, subject to closing conditions and a preferential right of purchase, a definitive purchase agreement to acquire properties in the Jonah Field, located in the Green River Basin of southwest Wyoming, from BP America Production Company for a contract price of $1.025 billion.

113.    On July 26, 2012, LINN issued a press release announcing its financial results for its 2012 second quarter, the period ended June 30, 2012. For the quarter, the Company reported net income of $237 million, or $1.19 per unit, including a noncash gain of $304 million, or $1.52 per unit, from the change in fair value of hedges covering future production.

114.    With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of .97x, compared to 1.14x for the first quarter 2012 and that it generated adjusted EBITDA of $319 million during the second quarter 2012, compared to $302 million for the

first quarter 2012. In addition, the press release included disclosure explaining and reconciling

LINN's adjusted EBITDA as noted in ¶43 above.

115.    Defendant Ellis commented on the results, stating, in pertinent part, as follows:

LINN has delivered outstanding performance this year. We achieved a company
record with $2.8 billion of acquisition announcements. The long-life, low decline
acquisitions are expected to add 300 million cubic feet equivalent per day of
production and increase total reserves by 1.7 Tcfe to 5.1 Tcfe.

Our second-quarter distribution coverage ratio was negatively impacted by
historically low NGL prices, which were 38 percent lower than first-quarter 2012
prices. However, with a full-year impact from 2012 acquisitions, robust organic
growth and industry-leading oil and natural gas hedge positions, we expect our
distribution coverage ratio to be approximately 1.2x in 2013. Furthermore, we
believe the current weakness in commodity prices will continue to present LINN
with additional accretive acquisition opportunities.

116.    Following the Company's 2012 second quarter earnings announcement, LINN held a

conference call with analysts and investors to discuss the Company's earnings and operations.

During the conference call, Defendants made positive statements about the Company's adjusted

EBITDA and cash flows. For example, Defendants stated, in pertinent part, as follows:

Defendant Ellis:

As I mentioned earlier, LINN announced a total of approximately $2.8 billion in
acquisitions and joint venture agreements during the first half of the year. These
transactions are expected to be immediately accretive to distributable cash flow per
unit, and the Company has already hedged approximately 100% of expected oil
production from these assets through 2016 and natural gas production through 2017.

Defendant Rockov:

Adjusted EBITDA for the second quarter of 2012 was $319 million. On a per-unit
basis, our distributable cash flow was $0.70 for the second quarter. Due to the
impact of historically low NGL prices, we reported a distribution coverage ratio of
0.97 times.

Turning to guidance for the full year 2012, we continue to see weaknesses in NGL
pricing during the second half of the year and have adjusted guidance accordingly. At
the midpoint of our range, we expect to generate adjusted EBITDA of approximately
$1.4 billion. Distributable cash flow is estimated to be approximately $618 million.
We project coverage to be approximately 1.1.times for the second half of the year.

Looking forward into 2013 and our shift to oil-weighted drilling and the full financial impact from acquisitions we have announced to date, we project coverage to be in a range of 1.2 times even absent a full recovery of NGL pricing.

Adhering to our strategy, and (inaudible) all effective oil and natural gas volumes (inaudible) with the $2.8 billion in acquisitions, and have been aggressively building our long-dated positions on legacy production. We have now hedged 100% of our expected natural gas production for six years through 2017.

With respect to oil, we are now hedged 100% at attractive prices for five years through 2016.

We believe our industry-leading hedging strategy is providing the obvious -- excellent distribution stability through a commodity price downturn, and we've also protected our assets and cost of capital. In the current environment, our hedge book positions LINN to be a buyer when other companies are sellers. This trend is clearly evident in our $2.8 billion of announced acquisitions and joint venture so far this year.

117.    That same day, July 26, 2012, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the 2012 second quarter ended June 30, 2012 (the "2012 Q2 Form 10-Q"). The 2012 Q2 Form 10-Q contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

118.    On October 25, 2012, LINN issued a press release announcing its financial results for its 2012 third quarter, the period ended September 30, 2012. For the quarter, the Company reported net loss of $430 million, or $2.18 per unit, including a noncash loss of $520 million, or $2.63 per unit, from the change in fair value of hedges covering future production.

119.    With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.40x, compared to .97x for the second quarter 2012 and that it generated adjusted EBITDA of $402 million during the third quarter 2011, compared to $319 million for the second quarter 2012. In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in ¶43 above.

120.    Defendant Ellis commented on the results, stating, in pertinent part, as follows:

We continue to see strong performance from our Hogshooter drilling program located in the Granite Wash area and expect to drill 11 additional wells by the end of the year. I'm proud of our strong operational performance and the ability to seamlessly integrate the record amount of acquisitions completed this year.

The LinnCo initial public offering is a game-changer for the company as it creates an additional option for institutional and retail shareholders to invest in LINN Energy. We expect it to provide the company with greater access to capital further allowing LINN to accelerate its acquisition growth strategy.

121.    Following the Company's 2012 third quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendant Rockov stated, in pertinent part, as follows:

For the third quarter, adjusted EBITDA was $402 million.  On a per-unit basis, our distributable cash flow was $1.01.  We achieved a greater than expected distribution coverage ratio of 1.4 times, which was driven by higher volumes and lower costs.

In addition, stronger coverage was also impacted by acquisition-related cash flow for the Jonah acquisition, which includes six months of results in one quarter.  Also, the Jonah acquisition was funded entirely by the revolver during the quarter, which was subsequently refinanced by the LinnCo IPO.  These two factors explain most of the variance between Q3 and expected Q4 coverage.

Now we'll turn to guidance for the fourth quarter 2012. At the midpoint of our guidance range, we expect to generate adjusted EBITDA of approximately $382 million. Distributable cash flow is estimated to be approximately $180 million, which implies a distribution coverage ratio of approximately 1.08 times in the fourth quarter.

At the midpoint in the guidance for the full year 2012, we expect to generate adjusted EBITDA of approximately $1.4 billion.  Distributable cash flow is estimated to be $684 million, which implies a distribution coverage ratio of approximately 1.14 times for the full year 2012.

Looking forward to 2013, we continue to believe our coverage ratio is on pace to be approximately 1.2 times.  Obviously, potential accretive acquisitions should allow us to exceed the 1.2 coverage, which creates the potential to continue to grow the distribution at an attractive rate.

122.    That same day, October 25, 2012, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the 2012 third quarter ended September 30, 2012 (the "2012 Q3 Form 10-Q"). The 2012 Q3 Form 10-Q contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

123.    On February 21, 2013, LINN, LinnCo, LLC ("LinnCo") and Berry Petroleum Company ("Berry") announced the signing of a definitive merger agreement pursuant to which LINN and LinnCo will acquire all of Berry's outstanding shares for total consideration of $4.3 billion, including the assumption of debt.

124.    Also, on February 21, 2013, LINN issued a press release announcing its financial results for its fiscal 2012 fourth quarter and year end, the periods ended December 31, 2012. For the year, the Company reported a net loss of $387 million, or $1.92 per unit, including a noncash loss of $278 million, or $1.39 per unit, from the change in fair value of hedges covering future production. For the 2012 fourth quarter, the Company reported a net loss of $187 million, or $0.83 per unit, including a noncash loss of $8 million, or $0.03 per unit, from the change in fair value of hedges covering future production.

125.    With respect to the sufficiency of its cash flows, the Company reported a 2012 distribution coverage ratio of 1.14x, compared to 1.24x for the 2011 year and that it generated adjusted EBITDA of $1.4 billion during 2012 compared to $998 million in 2011. In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in ¶43 above.

126.    Defendant Ellis commented on the results, stating, in pertinent part, as follows:

LINN delivered a record-setting 2012, closing approximately $2.9 billion in acquisitions and joint-venture agreements and increasing organic production by 15

percent.  Through organic growth and acquisitions, the company increased reserves by 42 percent to 4.8 Tcfe.  Most significant to our unitholders, our outstanding performance enabled us to raise our quarterly cash distribution by five percent for the third year in a row and pay our 28th consecutive distribution.

We created LinnCo to provide an additional way for institutional and retail shareholders to invest in LINN and to give the company greater access to capital.  In addition, as evidenced today with our announcement of a merger agreement with Berry, LinnCo has provided us with the right currency and structural flexibility to merge with C-Corps in a tax efficient manner.  We believe LinnCo will continue to give LINN the ability to capitalize on the very robust acquisition environment we anticipate in 2013.

127.    Following the Company's 2012 fourth quarter and year-end earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendant Rockov stated, in pertinent part, as follows:

For the fourth quarter, adjusted EBITDA increased by 35% to $379 million and 40% to $1.4 billion for the full year 2012.  On a per unit basis, our distributable cash flow was $0.77 per unit for the fourth quarter and $3.30 per unit for the full year 2012.  When compared to our quarterly cash distribution of $0.725 per unit, our annualized distribution of $2.90 per unit, we achieved a distribution coverage ratio of 1.07 times for the fourth quarter and 1.14 times for the full year 2012.  We delivered adjusted net income for the fourth quarter 2012 of $0.41 per unit and $1.44 per unit for the full year 2012.

Our strategy of acquiring mature oil and gas assets across the US has been very successful.  During our Company's history, we have made 57 acquisitions, totaling approximately $10 billion which is resulted in distribution growth of 81% since our IPO in 2006.  But today, we have broken new ground with the help of another visionary management team at a Berry Petroleum. Just like mature oil and gas assets belong in an MLP, we believe C Corps with mostly mature assets also belong in an MLP.  We very much thank the Berry management and board for giving us the opportunity to demonstrate how much value can be created by tax-efficiently converting a C Corp with the right assets into an MLP/LLC. Our combination is expected to result in significant accretion distributable cash flow per unit.

128.    Later on the conference call, when a securities analyst tried to get clarification with regard to the amortization of the Company's hedging securities, Defendant Rockov was dismissive of his request and terminated that conference call, stating, in pertinent part:

Sonny Ciccone - SunTrust Robinson Humphrey – Analyst:

On the hedges, what's the -- I don't know if you could gave figure earlier but what is the amortization on the previously put-on-puts basically per quarter?

Defendant Rockov:

We got into that issue as well, the cost of the puts is flowing through to our mark-to-market accounting, and I would refer you to the document that we filed last Friday.  I don't want to get into every little detail of every quarter and every year.

Operator:

This concludes our question-and-answer session for today.  If anyone has any further questions, you can follow up with Linn's Investor Relations department.  Now would like to hand the call back over to Mark Ellis for closing remarks.

129.    On February 21, 2013, LINN also filed with the SEC its Form 10-K, signed by the Individual Defendants, for the year ended December 31, 2013 (the "2012 Form 10-K").  The 2012 Form 10-K contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

130.    On April 1, 2013, LINN announced that it posted on its website a presentation with supplemental information regarding cash flow for operating activities, maintenance capex and net asset value.

131.    On April 25, 2013, LINN issued a press release announcing its financial results for its 2013 first quarter, the period ended March 31, 2013.  For the quarter, the Company reported a net loss of $222 million, or $0.96 per unit, including a noncash loss of $189 million, or $0.82 per unit, from the change in fair value of hedges covering future production.

132.    With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of .88x, compared to 1.07x for the fourth quarter 2012 and that it generated adjusted EBITDA of $356 million during the first quarter 2013, compared to $379 million for the fourth quarter 2012. In addition, the press release included disclosure explaining and reconciling LINN's adjusted EBITDA as noted in ¶43 above.

133.    Defendant Ellis commented on the results, stating, in pertinent part, as follows:

While the company experienced a challenging operating environment in the first quarter, the high quality and depth of our inventory still gives us the ability to grow organic production nearly 10% in 2013. This production growth will allow the company to steadily increase its distribution coverage ratio throughout the year.

Furthermore, we are pleased to have announced earlier this year a landmark, $4.3 billion merger agreement with Berry Petroleum. Berry's mature, high-margin assets are an excellent fit for LINN Energy, and we believe the transaction provides significant value to investors of all three companies. LinnCo has provided us with the right structure and financial flexibility to merge with C-Corps in a tax efficient manner. Going forward, we believe LinnCo will continue to provide LINN the ability to benefit from acquisitions of both private and publicly-traded C-Corps.

134.    Following the Company's 2013 first quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendant Rockov stated, in pertinent part, as follows:

For the first quarter of 2013, the Company increased adjusted EBITDA by 18% to $356 million compared to $302 million during the previous year.  On a per unit base our distributable cash flow was $0.64 per unit for the first quarter, hich resulted in a distribution coverage ratio of .88.  Adjusted net income for the first quarter 2013 was $0.16 per unit.

First quarter financial results were lower than expected, we still expect coverage to continue to increase throughout the year.  We project coverage to average approximately 1.07 for the second half of 2013, assuming six months contribution from Berry and including the 6.2% distribution increase, which we intend to recommend to the board of directors following closing of the transaction.

135.    That same day, April 25, 2013, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the 2013 first quarter ended March 31, 2013 (the "2013 Q1 Form 10-Q"). The 2013 Q1 Form 10-Q contained materially false and misleading statements about the Company's adjusted EBITDA and disclosure controls and Defendants Ellis's and Rockov's false and misleading certifications thereon.

136.    Defendants' statements referenced above in ¶¶41-43, 45-47, 51-55, 58-62, 66-70, 72-76, 79-83, 86-95, 98-102, 107-11, 113-22, 124-29, 131-35 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that the Company failed to sufficiently disclose how its reported distributable cash flow, or DCF, and its distribution coverage ratio were derived;

(b)    that the Company failed to disclose that its reported adjusted EBITDA included the financial benefits of its hedging strategies while the financial costs were not;

(c)    that the Company failed to disclose known events or uncertainties associated with its reported cash flows;

(d)    that as a result of (a) – (c), Defendants materially misrepresented the true risk associated with the Company's ability to continue to issue stable or increasing cash distributions;

(e)    that the Company's disclosure controls were materially deficient and its representations concerning them were materially false and misleading;

(f)    that certifications issued by Defendants Ellis and Rockov associated with the Company's disclosure controls were materially false and misleading; and

(g)    that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its cash flows, distributions and future financial prospects.

137.    After the close of trading on Friday, February 15, 2013, in response to statements issued by anonymous short sellers, LINN posted to its website a presentation entitled "LINN's Hedging Strategy and Response to Inaccurate Statements made by an Anonymous Short Seller." The presentation represented, in pertinent part, as follows:

> [LINN t]ypically budget[s] up to 10% of the cost of an acquisition for put expenditures
>
> *        *        *
>
> LINN considers the cost of puts as a "capital" investment and views it as an additional cost of an acquisition (hence the target to spend up to 10% of the cost of an acquisition on puts). No one disputes that "depreciation" of oil and natural gas assets should be excluded from EBITDA or distributable cash flow because it is a "capital" expense, and the company views puts the same way.
>
> When LINN purchases puts, the company pays 100% of the cost in upfront cash and capitalizes them as an asset on the balance sheet.

138.    On February 16, 2013, *Barron's* published an article entitled "Drilling Into the Numbers." The article noted that LINN may be overstating its cash flow available for distribution, by not deducting the cost of financial derivatives, stating, in pertinent part, as follows:

> Linn (ticker: LINE) hedges all of its oil and natural-gas output with financial derivatives, the better to provide a steadily growing level of income to unit holders. The company pays an annualized distribution-the MLP equivalent of a dividend-of $2.90 per unit, which equates to a yield of 8%, based on its current share price of $36.
>
> That yield has attracted investors, but they could be overpaying. Linn's units trade for 10 times 2012 pretax cash flow, roughly double the valuation of energy exploration and production companies such as Apache (APA), Devon Energy (DVN), and Canada's Suncor Energy (SU), and in excess of valuations accorded smaller energy producers structured as MLPs.
>
> Moreover, Linn may be overstating the cash flow available for distribution, by not deducting the cost of financial derivatives-mainly put options-from its realized gains on hedging activities in its quarterly results. Bears argue that funds invested in derivatives should be treated as an expense, and at least one of Linn's major competitors follows that approach. Linn says its energy derivatives are an integral part of its corporate strategy and amount to an asset, much like an oil and gas property. The value of such assets typically gets depreciated over their useful life.

- 43 -

\*    \*    \*

Wall Street analysts have ignored the derivatives issue until now.  Thirteen of the 18 analysts who follow the company rate it Buy, and bulls note that Linn's energy production, including oil, gas, and natural-gas liquids, more than doubled in last year's third quarter, to the equivalent of 782 million cubic feet per day.

But David Amoss, an analyst at Howard Weil, broke ranks on Friday and downgraded Linn to Sector Perform from Outperform, citing the company's treatment of its hedging costs. Amoss cut his estimate of 2013 distributable cash flow to $2.45 per unit from $3.03, "to better reflect the underlying cost of the hedges" that he estimates at $120 million annually, he wrote in a client note. Linn might have to make accretive acquisitions this year to cover its $2.90 distribution, he added.  Alternately, it is possible the distribution could be cut.  Linn shares fell 3.8% on Friday, but still trade for two times book value.

Linn has projected distributable cash flow of $684 million, or $3.31 a share, for 2012.  It is due to report fourth-quarter results on Thursday.

Hedging gains contribute a sizable percentage of Linn's distributable cash flow.  The company spent $583 million on derivatives purchases in the first nine months of 2012, and hedging gains in that period totaled $281 million, or 55% of distributable cash flow of $503 million. The company's financial reports don't break out the derivatives costs that are included in gains, but Linn's history of derivatives purchases suggests annual costs of $100 million to $150 million. Amoss' $120 million estimate is squarely in that range.

Linn expenses the cost of puts and other derivatives over a multiyear period when calculating net income, as mandated by accounting rules.  But it doesn't deduct such costs from distributable cash flow, a financial measure that isn't compiled in accordance with GAAP, or generally accepted accounting principles. This means companies have leeway in making the latter calculations. Usually, they subtract interest expense and maintenance capital expenditures from gross cash flow to derive the amount of cash available to be distributed to holders.

While net income is the most common financial yardstick for corporations, it can be of little use in evaluating MLPs, particularly partnerships like Linn that make heavy use of derivatives for hedging.  Quarterly changes in the value of a multiyear hedge portfolios can overwhelm and distort operating results.

Linn reported a net loss of $430 million in the third quarter, for instance. But it determined that distributable cash flow totaled $202 million.  The discrepancy was caused primarily by $520 million of unrealized losses in its derivatives book, which occurred in a quarter when energy prices rose.

LINN'S derivatives portfolio has insulated the company from a weak natural-gas market, and allowed it to pay a steadily rising distribution.  In the third quarter, it

- 44 -

received a price of $2.71 per thousand cubic feet for its natural gas, but realized more than $5 per Mcf after accounting for hedging gains.

MLPs and other energy companies can use swaps or purchase put options to lock in future oil and gas prices. (Puts give the holder the right to sell a security or commodity at a fixed price by a predetermined date.) Some companies prefer swaps to puts because puts are more expensive. Most swaps are executed "at the money," meaning they are based on future oil and gas prices implied in the futures market. The advantage of a put is that the holder gets upside above the put price.

It appears from Linn's financial statements that the company bought a considerable amount of in-the-money put options on natural gas last year. These are more expensive than at-the-money puts. Specifically, Linn bought a lot of puts struck at $5 per Mcf from 2013 through 2017 at a time when the "strip" (the average price for that five-year period) was in the $4 to $4.50 range. The puts would have had an intrinsic value of 50 cents or more. Gas now trades around $3.15 per Mcf, after averaging $3 in 2012, making the puts more valuable still.

The likelihood of such gains explains why Linn spent almost $600 million on derivatives purchases in the nine months ended in September, up from just $134 million in all of 2011. Given Linn's accounting for derivatives, the put purchase prices eventually should be reflected as a hedging gain in cash flow. Linn says last year's hefty derivatives purchases reflected sizable acquisitions. It spent $2.8 billion on energy deals in 2012.

139.    On May 4, 2013, *Barron's* published an article entitled "Twilight of a Stock- Market Darling." The article noted LINN's distributable cash flow looks significantly overstated, stating, in pertinent part, as follows:

Linn Energy may be the country's most overpriced large energy producer. The controversial domestic oil-and-gas company, which is structured as a publicly traded partnership, has for years used aggressive accounting to prettify its financial statements, and serial acquisitions to shore up its reserves. Signs now suggest that those strategies, which are legal, may no longer be working.

\*       \*       \*

Many investors look no further than the company's large and growing distribution as a sign of health. Linn yields 7.5%. In the first quarter, however, it failed to produce enough cash to cover its distribution, even by its generous measure of distributable cash flow. Should the company ever cut its payout, its units could plunge.

\*       \*       \*

Linn's distributable cash flow looks significantly overstated. For starters, it doesn't reflect the cost of financial derivatives, mainly in-the-money put options on natural

gas. That was the subject of a recent, skeptical Barron's article ("Drilling Into the Numbers," Feb. 18), when the stock traded at about $36. Since then, Linn has stated that it will stop buying puts, which allow it to sell gas for above-market prices.

140.    On this news, LINN units declined $1.97 per unit, or approximately 7%, to close at $35.75 per unit on May 6, 2013.

141.    On June 4, 2013, LINN filed a registration statement with the SEC in connection with its proposed acquisition of Berry. Buried in a footnote on page 257 of the registration statement, LINN disclosed that it considers the cost of premiums paid for put options as an investment related to its underlying oil and natural gas properties only for the purpose of calculating the non-GAAP measures of adjusted EBITDA and DCF, stating, in pertinent part, as follows:

> LINN considers the cost of premiums paid for put options as an investment related to its underlying oil and natural gas properties only for the purpose of calculating the non-GAAP measures of adjusted EBITDA and DCF. The premiums paid for put options that settled during the three months ended March 31, 2013 and March 31, 2012 and during the years ended December 31, 2012, 2011 and 2010 were approximately $43 million, $26 million, $148 million, $88 million and $94 million, respectively.

142.    On June 15, 2013, *Barron's* published an article entitled "Linn Comes Clean on Derivative Costs." The article noted that the Company wants to recognize the financial benefits of its put options, but not the costs, stating, in pertinent part, as follows:

> A surprise disclosure from Linn Energy (ticker: LINE), buried in a recent regulatory filing related to its planned merger with Berry Petroleum (BRY), supports the view put forth in Barron's that the oil and natural-gas producer's distributable cash flow is overstated and doesn't cover its distributions to investors.

> One of the key controversies surrounding Linn, which is structured like a master limited partnership, is the accounting for its energy derivatives in its distributable cash flow, a key financial measure for MLPs. Distributable cash flow (DCF) is the basis for Linn's distribution, the MLP equivalent of a dividend. Linn has a market value of $7.5 billion, plus $6 billion of debt.

> Linn has realized above-market prices for its natural gas due to its use of derivatives, including in-the-money put options. This has allowed the company to get more than $5 per million British thermal units for its gas when the market price has been $4 or lower.

Linn argues that the put options amount to a capital investment, so their cost shouldn't be deducted from distributable cash flow. The company has leeway in computing DCF because the measure isn't governed by generally accepted accounting principles.

*Barron's* view is that Linn's accounting is aggressive, because the company wants to recognize the financial benefits of the puts, but not the costs ("Twilight of a Stock Market Darling," May 6). In its GAAP-compliant net income, it recognizes its derivative expense.

"It's the gain or loss from the derivative transaction that must be reflected in pre- tax accounting income, not merely the proceeds derived from the sale or disposition of the derivative," says New York tax expert Robert Willens. "I can't think of an accounting principle or theory that would permit recording only the proceeds from the derivative while ignoring the cost."

143.    On this news, LINN units declined $0.55 per unit or nearly 2%, to close at $30.52 per unit on June 17, 2013.

144.    Then, on July 1, 2013, after the market closed, the Company issued a press release announcing that the SEC commenced an informal inquiry and it "has requested the preservation of documents and communications that are potentially relevant to, among other things, . . .LINN's . . . use of non-GAAP measures and hedging strategy."

145.    On this news, LINN units plummeted $6.24 per unit, or nearly 19%, to close at $27.05 per unit on July 2, 2013.  The next day, the price of LINN units plummeted an additional $4.26 per unit, or nearly 16%, to close at $22.79 per unit on July 3, 2013.

146.    The market for LINN units was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, LINN units traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the  Class purchased or otherwise acquired LINN units relying upon the integrity of the market price of  LINN units and market information relating to LINN, and have been damaged thereby.

147.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of LINN units, by publicly issuing false and misleading statements and omitting to

disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

148.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about LINN's business, cash flows, prospects and operations. These material  misstatements and omissions had the cause and effect of creating in the market an unrealistically  positive assessment of LINN and its business, cash flows, prospects and operations, thus causing the  Company's units to be overvalued and artificially inflated at all relevant times. Defendants'  materially false and misleading statements during the Class Period resulted in Plaintiff and the other  members of the Class purchasing the Company's units at artificially inflated prices, thus causing the  damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

149.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding LINN, their control over, and/or receipt and/or modification of LINN's allegedly

materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

150.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

151.    Individual Defendants, because of their positions with LINN, controlled the contents of the Company's public statements during the Class Period. Each Individual Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of these Defendants is responsible for the accuracy of LINN's corporate statements and are, therefore, responsible and liable for the representations contained therein.

152.    The scienter of the Defendants is underscored by the Sarbanes-Oxley mandated certifications of Defendants Ellis and Rockov, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about LINN was made known to them and that the Company's disclosure-related controls were operating effectively.

153.    In addition, Defendants were motivated to engage in the fraudulent course of conduct alleged herein in order to facilitate LINN's numerous capital raising debt and equity offerings during the Class Period.

154.    Defendants were further motivated to engage in this fraudulent course of conduct in order to allow Company insiders to sell shares of their personally held LINN units at inflated prices yielding them proceeds of approximately $34.6 million during the Class Period:

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Alcorn George A | Director | 05-Apr-2010 | 8,000 | $25.84 | $206,720 |
| Alcorn George A | Director | 10-Nov-2010 | 1,280 | $36.90 | $47,232 |
| | | | 9,280 | | $253,952 |
| | | | | | |
| Linn Michael C | Officer and Director | 13-Sep-2010 | 352,900 | $30.84 | $10,883,436 |
| Linn Michael C | Officer and Director | 14-Sep-2010 | 408,100 | $30.49 | $12,442,969 |
| Linn Michael C | Officer and Director | 15-Sep-2010 | 39,000 | $30.15 | $1,175,694 |
| Linn Michael C | Officer and Director | 02-Aug-2011 | 44,149 | $39.69 | $1,752,274 |
| Linn Michael C | Officer and Director | 02-Aug-2011 | 62,500 | $39.89 | $2,493,125 |
| Linn Michael C | Director | 28-June-2012 | 55,625 | $36.95 | $2,055,344 |
| Linn Michael C | Director | 28-June-2012 | 76,875 | $36.95 | $2,803,581 |
| | | | 1,038,149 | | $33,606,423 |
| | | | | | |
| Rottino David B | Officer | 10-Aug-2012 | 20,000 | $38.86 | $777,200 |
| | | Total | 1,067,429 | | $34,637,575 |

## LOSS CAUSATION

155.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of LINN units and operated as a fraud or deceit on Class Period purchasers of LINN units by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of LINN units declined significantly as the prior artificial inflation came out of the Company's unit price.

156.    As a result of their purchases of LINN units during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

Defendants' false and misleading statements had the intended effect and caused LINN units to trade at artificially inflated levels throughout the Class Period, reaching as high as $42.57 per share on November 1, 2012.

157.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of LINN's business, cash flows and prospects.  As the truth about the Company was revealed to the market, the price of LINN units fell significantly.  These declines removed the inflation from the price of LINN units, causing real economic loss to investors who had purchased LINN units during the Class Period.

158.    The declines in the price of LINN units after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in LINN units negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

159.    The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of LINN units and the subsequent significant decline in the value of LINN units when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

160.    At all relevant times, the market for LINN units was an efficient market for the following reasons, among others:

(a)    LINN units met the requirements for listing, and were listed and actively traded on the NASDAQ Global Select Market, a highly efficient, electronic stock market;

- 51 -

(b)      as a regulated issuer, LINN filed periodic public reports with the SEC and the NASDAQ Global Select Market;

(c)      LINN regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      LINN was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

161.    As a result of the foregoing, the market for LINN units promptly digested current information regarding LINN from all publicly available sources and reflected such information in the prices of the units.  Under these circumstances, all purchasers of LINN units during the Class Period suffered similar injury through their purchase of LINN units at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

162.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was

false, and/or the forward-looking statement was authorized and/or approved by an executive officer

of LINN who knew that those statements were false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

163.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully

set forth herein.

164.    During the Class Period, Defendants disseminated or approved the materially false

and misleading statements specified above, which they knew or deliberately disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not

misleading.

165.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements

made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a

fraud and deceit upon the purchasers of the Company's units during the Class Period.

166.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

the market, they paid artificially inflated prices for LINN units.  Plaintiff and the Class would not

have purchased LINN units at the prices they paid, or at all, if they had been aware that the market

prices had been artificially and falsely inflated by Defendants' misleading statements.

167.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their purchases of LINN units

during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

168.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

169.    The Individual Defendants acted as controlling persons of LINN within the meaning of §20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of LINN, and their ownership of LINN units, the Individual Defendants had the power and authority to cause LINN to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as the Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 12, 2013

LAW OFFICES OF CURTIS V. TRINKO, LLP

Jennifer E. Traystman

Curtis V. Trinko
C. William Margrabe
16 West 46th St., 7th Floor
New York, NY 10036
Telephone:  (212) 490-9550
Facsimile: (212) 986-0158
Email: ctrinko@trinko.com

Attorneys for Plaintiff James H. Harrison, Jr.

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

James H. Harrison, Jr. ("Plaintiff") declares:

1.    Plaintiff has reviewed the complaint and authorizes its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) in Linn Energy, LLC (LINE) that are the subject of this action:

**See attached Schedule.**

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years period prior to the date of this Certification (list if any):

*In re Mako Surgical Corp. Securities Litig.*, 0:12-cv-60875-JIC (U.S.D.C. S.D. Florida)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages directly related to the representation of the class) as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19 day of July, 2013.

James H. Harrison, Jr.

**SCHEDULE OF TRANSACTIONS IN LINN ENERGY, LLC (LINE)**
**FOR JAMES H. HARRSON, JR.**

| <u>Trade Date</u> | <u>Buy / Sell</u> | <u># of Shares</u> | <u>Price / Share</u> |
|---|---|---|---|
| 6/26/2013 | Bought | 300 shares | $34.61 |
| 7/02/2013 | Sold | 300 shares | $26.96 |